# Goersen *versus* Commonwealth.

1. An indictment for murder which charges that the defendant "did feloniously, wickedly and of malice aforethought kill and murder" a certain person, without specifying the mode or manner of the killing, is sufficient under the provisions of the Act of March 31st 1860, §§ 11, 20, Pamph. L. 433.

2. The above Act is not in conflict with section 9 of the Declaration of Rights, which declares that in all criminal prosecutions the accused has a right to demand the nature and cause of the accusation against him.

3. The "nature and cause" of a criminal prosecution is sufficiently averred by charging the crime alleged to have been committed. This must always be done. The "mode or manner" refers to the instrument with which the crime was committed, or the specific agency used to accomplish the result. It is not necessary to aver either of these in the indictment.

4. *Semble*, that whenever a prisoner before trial needs more specific information than is contained in the indictment to enable him to make a just defence, he may obtain it on proper application to the court.

5. As a general rule, where a person is on trial for one crime, evidence of his participation in another independent and distinct crime is not admissible against him. Such evidence is not admissible to impeach his general character or merely to prove a disposition to commit crime. It is, however, in such case admissible to establish identity, to show that the act charged was intentional and willful, not accidental, to prove motive, to show guilty knowledge and purpose, rebut any inference of mistake, in case of death by poison to prove that the defendant knew the substance administered to be poison, to show him to be one of an organization banded together to commit crimes of the kind charged, and to connect the other offence with the one charged, as part of the same transaction.

6. A prisoner being on trial for the alleged murder of his wife, by poisoning her with arsenic, the prosecution offered to prove that the prisoner's wife's mother had died by poison administered to her by him, a few days before the death of his wife, that the arsenic thus administered was of the same kind as that administered to the wife, that the two acts were part of a preconcerted scheme on the prisoner's part to obtain the money of his wife and his wife's mother, and also to rebut the theory that the death of the prisoner's wife was the result of accident, or suicide, or of the negligent or ignorant use or administering of arsenic as a medicine. *Held*, that the evidence was clearly admissible.

7. On a trial for murder the misstatement by the judge in his charge of any of the evidence bearing upon the prisoner's motive to commit the crime, constitutes cause for reversal on error.

8. Where in such case the judge prominently presents in his charge the theory and strong features of the prosecution, and ignores the theory of the defence and the facts on which it is based, this constitutes cause for reversal on error.

[Goersen *v.* Commonwealth.]

January 19th and 20th 1882. Before SHARSWOOD, C. J., MERCUR, GORDON, PAXSON, TRUNKEY, STERRETT, and GREEN, JJ.

ERROR to the Court of Oyer and Terminer of *Philadelphia county :* Of January Term 1881, No. 123.

Indictment against Albert G. F. Goersen for the murder of his wife Elizabeth E. Goersen.

The indictment charged " that Albert G. F. Goerson, late of the said county, yeoman, on April 4th 1880, at the county aforesaid, and within the jurisdiction of this court, with force and arms, &c., in and upon the body of one Elizabeth E. Goersen, in the peace of God and the said commonwealth then and there being, feloniously, willfully, and of his malice aforethought did make an assault, and her, the said Elizabeth E. Goersen, then there and feloniously, willfully, and of his malice aforethought, did kill and murder, contrary to the form of the Act of the General Assembly in such case made and provided, and against the peace and dignity of the commonwealth of Pennsylvania."

The defendant moved to quash the indictment, inter alia, because it furnished to him no information of the charge he was called upon to meet. The court, THAYER P. J., overruled the motion, whereupon defendant pleaded not guilty.

On the trial, before BIDDLE, J., the facts of the case appeared to be as follows. The defendant Albert G. F. Goersen was a man of about twenty-seven years of age. He was a homeopathic physician, and also a music teacher. On April 30th 1879, he married Elizabeth E. Souder, who resided with her mother, a widow, at No. 255 East Cumberland street, Philadelphia. After the marriage Goersen went to live with his wife and mother-in-law. He was of dissipated and intemperate habits, and was often in an unfit condition to handle and administer the drugs which he kept by him.

On March 25th 1880, Mrs. Souder, after an illness of about two months, died. The physician attending her, Dr. Francis Haynes, gave a certificate that the cause of her death was Bright's disease, and she was buried accordingly. Mrs. Souder, by her will, bequeathed to her daughter, defendant's wife, "all her personal things, and everything in the house." She had, under the terms of her husband's will, a life interest only in the house wherein she lived, the remainder being vested in her daughter in fee.

Mrs. Goersen became extremely despondent after her mother's death, and expressed the opinion that she would not live long. It was shown by one witness that upon one occasion she had in her hands a small vial labeled with a skull and crossbones, which Dr. Goersen snatched from her, telling the witness at the same time that it contained poison.

[Goersen *v.* Commonwealth.]

On March 30th Mrs. Goersen was taken sick, and was attended by her husband, the defendant. On April 1st he sent for a conveyancer, who drew up a will which Mrs. Goersen signed, whereby she devised and bequeathed all her property, which was of considerable value, to the defendant, constituting him her executor. On the evening of April 2d defendant called at the house of Dr. John R. Haynes, an allopathic physician, and requested him to call upon his wife. The latter did so, and found her in an extremely ill and weak condition. He prescribed certain remedies, including sulphate of morphine. During the time that he was in the house, defendant appeared to him to be in a semi-intoxicated condition, and asked whether, in case of Mrs. Goersen's death, he would furnish a certificate. To this question Dr. Haynes replied in the affirmative. After Dr. Haynes had gone, defendant went for the medicine prescribed, and having procured it, administered it to his wife.

On the evening of April 3d Dr. Frances L. Haynes, brother of the physician above spoken of, called to see Mrs. Goersen. He found her almost in a dying condition, and accordingly administered to her a hypodermic injection of one half grain of sulph-morphia. He then wrote a prescription for sulph-morph. and bi-carbonate of soda, accompanied with directions for use, and then left, after desiring to see Dr. Goersen, the defendant, when he came in. When defendant came in he looked at the prescription left by Dr. Haynes, remarked that his wife had had morphia enough, and then went over to see Dr. Haynes. Haynes told him his wife was very sick, but advised him not to administer any more morphia if she seemed drowsy. Goersen then returned to his wife's house, took a white powder from a bottle in his office, mixed it with water and gave it to his wife. He gave her, however, no morphia whatever. On the morning of the 4th Mrs. Goerson died.

Defendant at once became extremely anxious to obtain a certificate of his wife's death, and sent repeatedly to Dr. Haynes for one, which he, however, declined to give. Defendant was violently opposed to the holding of a coroner's inquest on his wife's body, but finally yielded. The body was opened on April 5th and was found to contain upwards of four grains of arsenic, whereupon defendant was arrested.

The theory of the prosecution was, that the prisoner had administered the arsenic to his wife in the shape of the white powder, his design being to murder her in order to obtain possession of her property. The theory of the defence was that Mrs. Goersen had committed suicide.

In the course of the trial the Commonwealth proposed to show that Mrs. Souder came to her death a few days before the death of Mrs. Goersen, by arsenic, administered by the prisoner

[Goersen v. Commonwealth.]

while prescribing for her during an attack of illness, and while she was residing in the same house with the prisoner and his wife; that the arsenic administered to Mrs. Souder was of the same description as that found in the stomach of the prisoner's wife; that the poison was administered to Mrs. Souder and Mrs. Goersen in pursuance of a design on the part of the prisoner to obtain the property, real and personal, of Mrs. Souder and Mrs. Goersen, a portion of which was derived under the will of John F. Souder; to show the purpose and intent of the prisoner, and the system by which that purpose was to be accomplished, and the connection of the death of Mrs. Souder and Mrs. Goersen with the said purpose and intent; and also, to rebut the theory that the death of Mrs. Goersen was the result of accident or suicide, or of the negligent or ignorant use or administration of arsenic, by either the deceased or the prisoner.

The defendant objected to this offer, on the ground that the death of Mrs. Souder constituted a separate and distinct offence from that on trial, and also because the Commonwealth had not offered evidence sufficient to show the existence of property in Mrs. Souder, that would have passed by her death to her daughter, the prisoner's wife. Objection overruled. Evidence admitted. Exceptions.

Under this offer the Commonwealth showed that Mrs. Souder's death had in many respects closely resembled that of her daughter, that she had been attended by the prisoner, and that upon the disinterring and opening of her body upwards of a grain of arsenic was found therein. It appeared that her disease was one in which arsenic was an appropriate remedy, but only in very minute quantities.

The court, after defining and distinguishing the different degrees of murder and manslaughter, charged as follows:—

"Juries in some cases find it difficult to determine the precise offence which has been committed; the Commonwealth and the prisoner often contending that the evidence establishes different degrees of guilt. This embarrassment you will be relieved from here, because the defence is, not that the offence is not murder of the first degree, if you believe the prisoner guilty of it, but that he is innocent of that, and equally innocent of both murder and manslaughter.

"So also as to the question of poison. It is established by the testimony of both Dr. Lee and Dr. Leffman that Mrs. Goersen, the prisoner's wife, died from the effects of poison. Dr. Leffman found over four grains of arsenic in the stomach alone, besides what he found in other parts of the body. That she died from poison the learned counsel for the prisoner does not pretend to deny.

"So that it being uncontroverted that she died from the effect

[Goersen *v.* Commonwealth.]

of poison, the real question for you to determine in this case is: who administered it to her?

"In cases of this character it is rarely possible to give direct evidence of the commission of the offence, and if that was required in all cases very many guilty people would escape, for the most dangerous crimes are generally committed in secret. A man instigated by a violent passion betrays himself, but the cool, deliberate offender against the law makes every preparation before and after his crime to conceal his offence.    What is called circumstantial evidence often supplies the want of direct evidence, and, where all the circumstances point to but one conclusion, is quite as satisfactory.    If your pocket is picked in the street and you turn round and seize a man with your watch in his hand, you have no doubt that he picked your pocket, though you did not see him do it.    If your money should be drawn out of bank by a forged check, and you found that it had been taken from your check-book, of which your confidential clerk had sole charge, and that he had drawn the money and fled the country, you would think it a monstrous injustice if, after you caught him and brought him here for trial, a jury should refuse to convict him, because you could not bring any one to swear that they saw him forge your name.

"In the present case, it is contended, on behalf of the Commonwealth, that it is established beyond a reasonable doubt that the prisoner at the bar perpetrated the offence.    They claim to have shown that he alone was pecuniarily interested in her death; that by her death he has secured the whole of her property, by a will executed two days before her decease; that, as her husband and physician, he had the opportunity to administer to her, and did administer any drug he chose without suspicion; that he did treat her during her short illness, which exhibited every day all the symptoms of poisoning by arsenic; that before her decease and immediately after it, he exhibited great anxiety to obtain a burial certificate from another physician, and, failing in this, he endeavored to retain one which he knew had been furnished by a young girl without the knowledge of her employer.

"The only physicians who saw her, besides her husband, both pronounced her very ill, and recommended remedies, but neither of them were asked to call again or to take charge of the case. Neither were the remedies recommended by them administered to her, showing, as the Commonwealth alleges, they were called in, as in the case of her mother, for the mere purpose of getting a certificate to bury her, and with no wish to effect a cure.

"A burial certificate from either of these physicians would probably have prevented a post-mortem examination, and would have lulled the suspicions which it seems were excited among the neighbors.    Therefore its importance to the prisoner.

[Goersen v. Commonwealth.]

" On the 30th of March Mrs. Goersen was first taken sick, and on the 4th of April she was dead. On the 25th of March her mother, who occupied the same house and was attended by Dr. Goersen, it was discovered, exhibited the same symptoms before her death as her daughter, and had died, and on the 27th had been buried. She, by her will, dated the 8th of March, had left all her interest in her deceased husband's estate to her daughter and the prisoner. On the disinterment of her remains arsenic was found in her body, and both Dr. Leffman and Dr. Lee pronounce without hesitation that the cause of her death was poisoning by arsenic.

" We thus have in one family two deaths by arsenic between March 25th, the death of the mother, and April 4th, the death of the daughter. We have the same physician treating them, and pecuniarily interested in both their deaths and in making of their wills.

" The amount that the mother-in-law had to leave was small, it is true, but there would still be a strong motive to get her out of the way, even if she had not a dollar. Her daughter was fondly attached to her, and, if the mother had been living when the daughter made her will, would she be likely to have left all her property to her husband? Would she have allowed her mother, in her old age, to have come to want and to be deprived of her home? Would this not naturally suggest itself to any one who contemplated getting rid of the daughter to get all her property? The death of the daughter would be of small avail to her husband if she left what she could to the mother.

" The answer of the prisoner depends not so much on a denial of the facts found by the Commonwealth, as on a denial of the inference which it is sought to be drawn from them. The learned counsel for the prisoner denies that they establish the guilt of his client, but that with the additional light which he claims to have thrown upon them they show that Mrs. Goersen willfully killed herself by taking arsenic. It will be your duty then to consider the facts, and endeavor to see if that conclusion can be fairly deduced from them.

" There certainly does not appear to have been any suspicion that she committed suicide, at the time of her death, by any one of her relatives or friends. Her husband did not suggest it, but asserted to the undertaker that she died from inflammation of the bowels. She, so far from appearing to be desirous to shorten her life, seemed, to the very last, to be using every effort to prolong it. She was constantly taking everything which her husband prescribed for her cure, and was anxious to know what Dr. Thomas thought of her condition. When Mrs. Willard, as late as Thursday, offered to come and sit with her on the next Sunday while her niece went to church, she said

[Goersen *v.* Commonwealth.]

'she thought by that time she would be well enough to come round to see us.' It was on that very Sunday she died.

"Her suicide is attributed to her grief at the death of her mother, but it is difficult to imagine that a woman thirty-seven years old, who, we are told, was fondly attached to her husband, should voluntarily kill herself because her mother had died at the advanced age of sixty-eight. The expressions attributed to her would indicate the natural grief and depression which such an event would cause, but were they of such a nature as would lead you to suppose that she was in a condition of mind to induce her to destroy herself? She expressed a willingness to die, if she could take her husband with her, that being the tie which induced her to desire to live. Would she be likely, therefore, to separate herself from him by a criminal act of her own?

"Her death, too, appears to have been a gradual one. Her illness beginning on Tuesday and suddenly terminating on Sunday, and during all that time exhibiting the symptoms of poisoning by arsenic.

"The theory of the defense does not of course account for the death of the mother. She died by precisely the same kind of poison, according to Dr. Leffman, and with the same symptoms and in the same house, and attended by the prisoner, nine days before. She, we are told, was afflicted with a complaint in which arsenic is a proper remedy, and the arsenic in her system is accounted for in that way. The amount, however, would seem to be far in excess of any proper prescription. Dr. Korndeffer, called for the prisoner, tells us that his prescription for the complaint of this old lady would be 1-1000 part of a grain every few hours, and Dr Leffman has exhibited from her stomach a little under two grains—almost two thousand doses. But if given in such minute doses it would never accumulate, as I understand the testimony, but would be taken up, and in six days no trace of it could be found in the stomach, and in fifteen days it could not be found in the system. So that the theory of minute doses would seem not to account for the result found by Dr. Leffman.

"It is also suggested that the daughter might have given her mother, by accident, too much of the homœpathic medicine which her mother was taking. But Dr. Leffman tells us the arsenic he found in Mrs. Souder's stomach was not the kind of arsenic prepared by the homœopathic formula.

"I have gone over briefly the main facts in the case, which have been elaborately presented in all their details by the counsel who have addressed you. The question is entirely one for your consideration and decision. You should be satisfied, beyond a reasonable doubt, of the guilt of the prisoner. There

[Goersen v. Commonwealth.]

is scarcely a case where a doubt cannot be suggested in human affairs, but the doubt that should influence you should be a well founded one, and one which would deter you from coming to a conclusion in an important matter of your own."

Verdict, guilty of murder in the first degree and sentence of death pronounced accordingly. Defendant thereupon took this writ, filing, inter alia, the following assignments of error.

1. The court erred in overruling the defendant's motion to quash the indictment.

2. The court erred in permiting the Commonwealth to introduce evidence of a distinct and separate offence from that for which the defendant was under indictment, and on trial.

4. The learned judge erred in his charge to the jury.

*Edmund Randall* and *William H. Ruddiman*, for the plaintiff in error.—The purpose of an indictment is to inform a defendant of the offence charged against him, that, if innocent, he may prepare to defend himself upon the trial.

The indictment in this case gave the prisoner no intelligence of the facts charged as a crime against him, and afforded him no opportunity for preparation to meet the allegations of the Commonwealth subsequently made on the trial.

The indictment must contain a specific description of the offence. Wharton's Crim. Prac. & Pl. 154–166. This indictment is apparently drawn up under the provisions of the act of March 31st 1860, § 20 : . . . . " It shall be sufficient, in every indictment for murder, to charge that the defendant did feloniously, willfully and of his malice aforethought, kill and murder the deceased." This section must, however, be read in connection with the rest of the act, including section 11 : " Every indictment shall be deemed and adjudged sufficient and good in law, which charges the crime substantially in the language of the act prohibiting the crime." Now this indictment charges the offence set out in section 74, same act :—" All murder which shall be perpetrated by means of poison . . . . shall be deemed murder in the first degree."

This indictment does not charge that the defendant did kill and murder by poison, and is not therefore drawn in conformity with the act prohibiting the crime.

The indictment is in direct violation of section 9 of the Declaration of Rights, giving the accused the right " to demand the nature and cause of the accusation against him."

The evidence as to Mrs. Souder's death was clearly improperly admitted : Regina v. Oddy, 5 Cox C. C. 210. There was lacking any evidence of motive on the prisoner's part to murder Mrs. Souder in connection with murdering his wife. This was essential to justify the admission of the evidence : Shaffner

*v.* Commonwealth, 22 P. F. Smith 60; State *v.* Lapage, 57 N. H. 245; Wharton's Crim. Ev. 8 ed. 50.

It is true that no specific exceptions were taken to the charge, but the court will overlook this.

"It is the duty of a judge, trying a man for his life, to charge fully upon the law, without regard to points presented by counsel. The rule that a judge is not to be convicted of error for what he omits to say, ought not to be applied in a capital case. The prisoner has a right to have the jury properly instructed upon every question of law legitimately raised by the evidence, and this right he cannot waive, nor can his counsel do so for him:" Meyers *v.* Commonwealth, 2 Norris 131. The charge of the judge palpably violated this rule. It was directly against the prisoner, giving undue prominence to the theory of the prosecution and wholly disregarding that of the defence and the facts on which it was based.

*George S. Graham,* district attorney, and *Henry S. Hagert,* for the Commonwealth.—The indictment is in the form commonly used in this county since the Act of March 31st 1860. Prior to that Act it was not necessary to specify the degree in the indictment: Commonwealth *v.* Gable, 7 S. & R. 424; White *v.* Commonwealth, 6 Binn. 183; or to allege that the murder was committed in the perpetration or attempt to perpetrate any one of the offences named in the Act of 1794. Commonwealth *v.* Flanagan, 7 W. & S. 418; Rhodes *v.* Commonwealth, 12 Wr. 396. And since the Criminal Procedure Act of 1860, the means used need not be set out: Lane *v.* Commonwealth, 9 P. F. S. 374.

It is alleged that the indictment is bad because in violation of the 9th section of the Declaration of Rights, which gives the accused the right "to demand the nature and cause of the accusation against him." But in Cathcart *v.* Commonwealth, 1 Wr. 115, the Act of 1860 was expressly held not to be in conflict with the Declaration of Rights, and in Commonwealth *v.* Twitchell, THOMPSON, C. J., in refusing an allocatur, held that the provisions of the Act were not in conflict with a similar provision of the Constitution of the United States. To the same effect is the later case of Campbell *v.* Commonwealth, 3 Norris 199, decided on the authority of Cathcart *v.* Commonwealth.

It is not to be doubted that evidence of collateral independent crimes cannot be received when offered simply to prove the prisoner's connection with the crime charged; or in other words, a man cannot be convicted of one offence by proving him to have been guilty at some other time of another and

[Goersen v. Commonwealth.]

independent offence; but neither is it to be doubted that evidence may be given of extraneous crimes where they form part of the res gestæ, or tend to exhibit a chain of circumstantial evidence of guilt in respect to the act charged, or where it is alleged that the crime in question was one of a system of mutually dependent crimes, or where such evidence tends to establish the identity of the person by whom, or the instrument with which, the crime was committed, or to prove guilty knowledge, intent or motive; and in cases of alleged murder by poison, other cases of death by the administration of poison at the hands of the party charged may be given in evidence, to rebut the defence of suicide or accident; or in chief, to exclude the possibility of death by either of these latter causes: King v. Wylie, 1 New Rep. 92; Queen v. Ellis, 6 B. & C. 145; Queen v. Cobden, 3 F. & F. 833; Queen v. Dossett, 2 Carr. & K. 306; Queen v. Harris, 4 F. & F. 342; Kramer v. Commonwealth, 6 Norris 299; Queen v. Taylor, 5 Cox C. C. 138; Queen v. Richardson, 2 F. & F. 343; Queen v. Salt, 3 F. & F. 834: Queen v. Foster, 24 L. J. (M. C.) 134; Kilrow v. Commonwealth, 8 Norris 480; Queen v. Reardon, 4 F. & F. 76; Queen v. Voke, Russ. & Ryan C. C. 531; Queen v. Clewes, 4 Carr. & P. 221; Walter v. People, 6 Park. 15; Johnson v. State, 17 Ala. 618; Ferrigan v. Commonwealth, 8 Wright 386; Turner v. Commonwealth, 5 Norris 54; Carroll v. Commonwealth, 3 Norris 107; Campbell v. Commonwealth, 3 Norris 187; Queen v. Roden, 12 Cox C. C. 630; Heath v. Commonwealth, 1 Rob. (Va.) 735; Brown v. Commonwealth, 26 P. F. Smith 319; People v. Doyle, 21 Mich. 221; Queen v. Geering, 8 L. J. N. S. (M. C.) 215; Queen v. Garner, 3 F. & F. 681; S. C., 4 Ib. 347; Queen v. Cotton, 12 Cox C. C. 400; Queen v. Heeson, 14 Cox C. C. 40; Shaffner v. Commonwealth, 22 P. F. Smith 61.

It is submitted that the charge was free from objection and omitted no material point.

Mr. Justice MERCUR delivered the opinion of the Court, March 20th 1882.

The first assignment of error is the refusal of the court to quash the indictment. The complaint is that it does not aver in what way or manner the murder was committed. Such objection is without force, since the Act of 31st March 1860. Section 20 thereof declares: "it shall be sufficient in every indictment for murder, to charge that the defendant did feloniously, willfully and of his malice aforethought, kill and murder the deceased." Section 11 provides that "every indictment shall be deemed and adjudged sufficient and good in law, which

charges the crime substantially in the language of the Act prohibiting the crime."

This indictment charges the murder in the language of the Act, to have been committed feloniously, willfully and with malice aforethought. Conceding this to be so, it is contended the Act is in conflict with section 9 of the Declaration of Rights, which declares that in all criminal prosecutions, the accused has a right to demand the nature and cause of the accusation against him. The argument is based on the assumption that "nature and cause" are equivalent to "mode or manner." They are clearly distinct. The nature and cause of a criminal prosecution is sufficiently averred by charging the crime alleged to have been committed. This must be done. The mode or manner refers to the instrument with which it was committed, or the specific agency used to accomplish the result. It is not necessary to aver either of these in the indictment. The 20th section of the Act is, therefore, not in conflict with the organic law. Cathcart *v.* Commonwealth, 1 Wright 108; Campbell *v.* Same, 3 Norris 187. Whenever one before trial needs more specific information than is contained in the indictment, to enable him to make just defence, it may be obtained on proper application to the court.

The second specification is to permitting the Commonwealth to give evidence of a separate and distinct offence, from that for which the accused was being tried. If that other offence, in fact, was separate and distinct from the one charged in the indictment, it is important to consider the purpose for which the evidence was offered. It is true, a defendant cannot be convicted of the offence charged, merely because he has committed another offence, either of a similar or a dissimilar kind. Hence, as a general rule, evidence of his participation in another independent and distinct crime, cannot be received simply for the purpose of proving his commission of the offence for which he is on trial: Whar. Crim. Ev. § 30; Coleman *v.* People, 55 N. Y. 90; State *v.* Renton, 15 N. H. 174; Commonwealth *v.* Campbell, 7 Allen 542; Shaffner *v.* Commonwealth, 22 P. F. Smith 60. It cannot be received to impeach his general character, nor merely to prove a disposition to commit crime. Yet under some circumstances, evidence of another offence by the defendant may be given. Thus it may be to establish identity; to show the act charged was intentional and willful, not accidental; to prove motive; to show guilty knowledge and purpose, and to rebut any inference of mistake; in case of death by poison, to prove the defendant knew the substance administered, to be poison; to show him to be one of an organization banded together to commit crimes of the kind charged; and to connect

[Goersen v. Commonwealth.]

the other offence with the one charged, as part of the same transaction.

The plaintiff in error was on trial for the murder of his wife by poison. The evidence of the death of Mrs. Souder, was admitted under an offer to prove that she died by poison administered to her by him, while she was residing in his house, a few days before the death of his wife, that the arsenic administered to Mrs. Souder was of the same description as that found in the stomach of his wife : that the poison was administered to Mrs. Souder and to his wife in pursuance of a design on his part to obtain their property : to show his purpose and intent, and the system by which that purpose was to be accomplished, and to connect the death of both women with that purpose and intent ; and also to rebut the theory that the death of Mrs. Goersen was the result of accident or suicide, or of the negligent or ignorant use or administering of arsenic by either his wife or by him. These purposes clearly brought the offer within the rule permitting the evidence of the other offence to be given. There was, therefore, no error in receiving the evidence.

The third assignment is without merit. The fourth assignment is to the charge of the court. The alleged errors therein are not assigned according to rule; yet the whole charge was filed and comes up as a part of the record duly certified.

The complaint is twofold, the one to stating portions of the evidence incorrectly to the jury, the other an omission to adequately instruct them on the important questions fairly arising under the evidence. We will consider them separately.

1. The court said " the only physicians who saw her, besides her husband, both pronounced her very ill, and recommended remedies ; but neither of them was asked to call again, or to take charge of the case, neither were the remedies recommended by them administered to her, showing, as the Commonwealth alleges, they were called in, as in the case of her mother, for the mere purpose of getting a certificate to bury her, and with no wish to effect a cure."

A reference to the evidence shows that Dr. John R. Haynes visited Mrs. Goersen on the evening of Friday, the 2d of April, and his brother, Dr. Francis L. Haynes, visited her on the evening of Saturday, the 3d, and she died on Sunday morning, the 4th of April. The former left a prescription for her. Sarah E. Souder, the attendant on Mrs. Goersen, and a witness called by the Commonwealth, testified that Dr. Goersen " went for the medicine ordered by Dr. Haynes, came back and administered it to her, once." On Saturday evening the other doctor, Haynes, administered a hypodermic injection of sulp. morphia into her arm, wrote a prescription, gave directions for its use, and requested her to send Dr. Goersen over as soon as he came

[Goersen *v.* Commonwealth.]

in. The latter called on Dr. Haynes the same evening. The latter "advised him not to administer the morphine powder if she became drowsy." Still later in the evening, the doctor sent his brother, Robert W. Haynes, who told Dr. Goersen not to give the medicine if she was sleeping. Each physician pronounced her very sick when he visited her. Thus there was evidence to submit to the jury to find whether some of the medicine prescribed on Friday evening was not in fact administered to her, and if none was on Saturday evening, whether it was not in pursuance of the directions of Dr. Haynes, and not by reason of any improper motive of Dr. Goersen, and whether she was not then beyond the curative power of medical skill.

It is further complained that the court said, Mrs. Souder, "by her will dated the 8th of March, had left all her interest in her deceased husband's estate to her daughter and the prisoner." An examination of the will of Mrs. Souder shows she devised to them only her "personal things and everything in the house," and made no reference to the estate of her deceased husband. The will of her husband gave her nothing beyond a support and maintenance during her natural life, so she acquired from him nothing to devise.

2. This is not the case of an entire omission to charge on the law and the evidence, beyond answering the points submitted in behalf of the plaintiff in error, for they were all affirmed. The error consists in prominently presenting the theory and strong features of the prosecution, and ignoring those of the defence. The defendant was a physician, and a person of intemperate habits. He kept medicines in a closet in his house. He was frequently in an improper condition to administer them. The Commonwealth proved by Sarah E. Souder, that she held the lamp for him while he mixed and administered to his wife some medicine, which is claimed to have been arsenic. If so, in view of his habits, the question arose, was it administered intentionally, or through gross negligence?

There was evidence that on the day of her mother's funeral, and afterwards, Mrs. Goersen was despondent, and expressed the opinion that she would not live long. It also appears that at one time she had in her hand a small vial with skull and cross-bones on it, and Dr. Goersen sprung and caught her hand, and took it from her, telling the witness, at the time, there was poison in it. The counsel for the Commonwealth manifestly saw the force of these two aspects of the case. As has already been shown, the evidence of the death of Mrs. Souder was admitted under its offer to rebut the theory of the death of Mrs. Goersen being the result of accident or suicide, or of the negligent or ignorant use or administering of arsenic by him or

[Yerkes's Appeal.]

by his wife. Although the evidence given bore directly on these two theories, the learned judge omitted to bring any of the details thereof to the attention of the jury, as questions worthy of their consideration. The burden of proof rests on the Commonwealth to establish the guilt of the accused beyond a reasonable doubt, and therefore a duty rested on it to rebut all other reasonable theories that might be deduced from the evidence : Turner v. Commonwealth, 5 Norris 54.

We are unable to discover any act on the part of Dr. Goersen, tending to prove undue influence on the mind of Mrs. Goersen, in the disposition of her property. On the contrary, the will which she executed appears to have been the result of a free exercise of her unbiassed judgment, and dictated by her when he was not present.

In view of the condition of Dr. Goersen soon after the death of his wife, much importance should not be given to the fact of his unwillingness, at first, to have an inquest held upon her body. It appears by the evidence of Charles A. Souder, an uncle of the deceased, that he talked to Dr. Goersen, on the subject, that the latter " asked if I thought it best to have an inquest. I advised one, and he said he was satisfied."

Without designating other omissions, we think the substantial and controlling theories naturally arising from the evidence were not, as they should have been, presented to the consideration of the jury. The charge inadaquately presented the case, in view of the circumstantial character of the evidence, and the gravity of the crime charged. The fourth specification is sustained.

Judgment reversed, and a venire facias de novo awarded.